And I gather you're splitting time 15 and 5? I am only splitting time with myself, Your Honor. Oh, so it's the other side you're splitting time. Got it. Oh, I guess I should see that. You're splitting time with your briefcase. I am. Actually, I'm going to reserve 20 minutes for rebuttal, but the briefcase will not. Okay. Now, how much time do you want for rebuttal? Five minutes. When you're ready. May it please the Court, good morning. My name is Greg Guillot, and I am counsel for the plaintiff-appellant Donna Corbello in this case, and I'm also pleased to report that we have a guest in the audience, Mr. Robert McCurgan, who was the trial counsel below, who's come to see things today. The one thing that I'd like to say at the beginning, I know the questions will immediately follow, is that this is not just another that's-my-movie case in which someone comes out of the woodwork, and they say, that's my intellectual property, and you've stolen it, and I want to make some money from it, alleging copying based on some tenuous information. In this case, rather than plaintiff doing that, when appellant Corbello was at home minding her own business, a plethora of public statements and articles started coming out from some of the defendants that are now in the case, most notably Jersey Boys director, Des McAnuff, and the writer, Rick Ellis, and so forth, indicating that Jersey Boys was largely based on the unpublished biography of Tommy DeVito. But the problem is, to start with, that if somebody's doing a historical movie book, whatever, you obviously read other accounts of the subject matter that you're dealing with, so it's different from a novel where the novel's plot isn't made up. No one's making this up. But Judge Berzon, do you-well, I'll address that second part next, but do you break in and steal the material so that you can do that historical background research? Well- And not that that's relevant necessarily to copyright, but this was an unpublished work that was not accessible, that really nobody knew about, even Rex Woodard, the author, and his wife's own family. No, it's a healing cause of action. It's not the one we've got here. Correct. On the second part of your statement, though, which relates to a theme that has been very prevalent in this case and is something that the defendants have raised and is something that Judge Jones in the court below has silently applied, the notion of copyright estoppel. In fact, there is very much in this book that is not true, which, interestingly, we can identify. And there's two reasons for that. One reason- When it says it's not true, though, is it representatively true? It is represented, sure, it's represented to be true, in the drawer at home of Donna Corbello having never been seen by another human being and without her relatives even knowing about it. And so it has not been, which is what's critical, and I'm happy to talk with you about that in terms of the copyright estoppel argument, it has never been publicly represented to be true. Before us at the moment. What we have, as I understand it, is a post-verdict JNOV, essentially, by the court, which reads to be on a fair use ground, but 80 percent of which, or 90 percent of which, is really on a no infringement ground, if you read through what he's actually saying. It sounds like it. All right. Well, so my going-in question is, why don't we look at this as an infringement problem? And, I mean, we could affirm on the ground that, well, maybe there wasn't fair- given what the jury found on infringement, you can't get to the fair use determination. He could. He did. But really what he was saying was that there was almost no infringement. Well, he was wrong. Well, okay, but on proposition first is that you address this on the ground of whether, on the question of whether the jury finding of infringement was, should have been overturned. It almost was. I mean, he was very close to doing that, and the question is, why don't we look at it that way? Well, whenever a court sends me a memo before oral argument saying, please be prepared to address this argument or this issue at the oral argument, I take that very seriously and, therefore, am happy and prepared to talk with you about that. I will not belabor or repeat because you already have seen many, many pages from me and know how I feel about the cross-appeal rule, of course. I mean, question A, as I understand it, is do we back up from the thin protection to thick protection? We must. And if we do, then you look at the work as a whole as to whether it's substantially similar and how can you prevail on that? Correct. How can you possibly prevail on that? Well, the only reason that Judge Jones was so close to, or seemingly so close to non-infringement determination is because, remember, I'm sure you know, going into the trial initially, he had employed copyright estoppel and other doctrines. I don't care what he did. We're looking now at objectively on the record, was the jury verdict sustainable? Yes. He was coming at it from the viewpoint of four similarities, that's all there are. I mean, except on the new trial issue, this is not an abuse of discretion question. It's an objective de novo question as to whether the jury verdict, there's substantial evidence to support the jury verdict on infringement. There is extremely substantial evidence, Your Honor. There is, first of all, the defendant's marked-up copy of the work is where we start. What we found in the course of discovery is that Rick Ellis, who was the primary person who did this, I thought when you do copyright infringement, there's the extrinsic test and the intrinsic test. We know that they knew about this, and we know that they used it to some degree. They relied on it to some degree. But anybody who's doing a historical work is going to rely on other historical works for information. They did more than that, Judge Berzahn. They began the construction of this play. They had another draft of the play called Oh, What a Night. It wasn't successful. They shopped it. Nobody was interested in it. They had talked to Frankie Valli and Bob Gaudio and the members of the board. You're really not addressing the appropriate copyright questions, which is, all right, let's assume all that happened. There's still a question of whether what they ended up with was infringing or not. Our expert witness, Richard Krebelin, opined that 30 percent of what was in Jersey Boys came from the work. And what they did, Your Honor, is they copied verbatim dialogue from the work, and not historical dialogue that was contemporaneously recorded, things that Rex Woodard made up. What I started to tell you – He purported not to make it up. No, he didn't purport not to make them up. And the reason that we know and knew that he made them up, there's two reasons. One is that this man was a huge fan of the Four Seasons, and he recorded every single interview that he had and even casual telephone conversations that he had with Tommy DeVito. And he also spoke with Nick Massey, another one of the Four Seasons, and Nick DeVito, who was in the early varietones, a precursor to the Four Seasons. And we, for every item of subject matter that is in the book, we have all of the associated recordings of those conversations. He was directed, maybe incorrectly, to look at just 12 examples. Of those 12 examples, the district court concluded that something like nine of them were not infringing, and I tend to agree with him. And as to the other three, I'm not sure he was right that there was any infringement. So is that what we should be looking at or something broader than that? We can't look at that, Your Honor. I mean, this court has already said in Dreamgates of Arizona, the PC on site, that that's a reversible error right there. A court, the district court, a district court is allowed to advise and must advise the jury, instruct the jury, on what is not protectable in a work. But a district court is not permitted to say this is what is protectable, these are the similarities that count, this is all of what I'm allowing you to look at. That is reversible error because it improperly limits the jury's consideration to certain aspects of the work as opposed to the whole work, which is what copyright asks them to do, which is what the intrinsic test requires them to decide. So that right there, that 12 similarities, which is part of what we allege is a pattern of abuse that began very early in the case. If we ourselves now look at the two works and say applying the extrinsic test, there's no way that these are substantially similar, that's the end of the story. I don't believe so. I think that that would be erroneous. Why? Well, aside from the cross-appeal rule. You would disagree with the conclusion, but if we did it, why would it be erroneous? Well, first of all, it would be something that the court of appeals would be doing sui sponte that the defendants have never even requested, ever. And it's something that Judge Jones never felt either. And let me point that out. When the defendants filed their post-trial JMOLs, their renewed motions for JML at the end of the trial, they did not request a determination that there was no infringement. But you agree that what Judge Jones did was 90 percent that. I mean, 90 percent of what he was doing. Now, he was confusing and confused as to whether he was applying thick or thin infringement. He was. But as to what he thought he was doing, most of what he concluded was that with regard to these 12 examples, there was an infringement. At the end of the first trial, when they were suing, the defendants were suing to recover attorney's fees, when we were coming up to the Ninth Circuit the first time and that first decision was reversed. There was only one trial. There was a second trial. There wasn't another trial. No, there was. That was summary judgment. He granted summary judgment the first time. Okay? And then we had an appeal because he invented this doctrine of a selectively exclusive license. He kept saying that the only scoundrel in the case was Tommy DeVito, who was my client's co-author. All right. You know all of that. But here's a quote from him. Because we have a lot to do here. We do. And this is what I wanted to read to you to cut to the chase. This is Judge Jones then in May 24, 2012. It's in our briefs, telling the defendants. They had a very reasonable basis to find infringement, they being us. They had a marked-up version of the unpublished work. They had conversations. They had memos. They had lots of evidence to have sustained a jury's finding that there was, in fact, infringement, even willful infringement and efforts to hide it. That was all before the trial. But there was no new evidence. But it was based on a comparison of the works. The judge, as much as he did not want us to win, and as much as he did to try and make the path difficult, what would have been easiest for him, which he never did, was to determine that there was no infringement under the extrinsic test. He never decided that there was no infringement and let the case out for that reason. He used other reasons. He tried to blame it on DeVito. And he could have, at the end of the case, as you note, if it was 90% he believed that there was no infringement, he could have issued a JMOL or issued some kind of judgment pre-trial or post-trial that there was no infringement. He did not do that. He never suggested that he would do that. He instead talked about all these other things to limit our case. He was extremely upset when the jury made its verdict. And I think that he thought, but I can't get into another individual's mind, that he was guiding the proceedings in such a way that it was not going to be possible for the jury to give us a verdict. I mean, think of this. We all know this. When he applied thin protection and we go into a trial and he says to the jury, you may only think about four similarities, right, or it turned out to be 12, he expanded, 12. Well, thin protection. But they must be virtually identical. Excuse me, virtual identity. Right. As to protectable elements. And I don't really see how there was virtual protection. I mean, virtual identity. I told him in the hearings, you'll see that in the record. Your Honor, do you realize what you're doing? Why are we even going to trial? How can the jurors find that these two works are virtually identical when you're only going to allow them look at four similarities out of a several hundred page book and a several hundred page script? So that is what he set up. If you looked at the book as a whole, you couldn't say that it was virtually identical. That's clear, right? That much is clear. No, I disagree, Your Honor. In fact, I think that when you read the book, Cindy Seen, Rex Woodard's sister, testified that she cried when she first saw the play because she saw the book come to life. That book, for us, for plaintiff, is every bit as much a derivative work or adaptation. I mean, the play, Jersey Boys, is every bit as much of a derivative work or adaptation. A derivative work is not virtually identical. Correct. Well, you told me not to focus on what Judge Jones determined. I asked you a different question now, which is if you applied a virtual identity standard, as a whole, there's no way that you could have infringement. No way. No way. But no literary work in U.S. history has ever been accorded thin protection. I almost feel like it's not even necessary to argue this to you because all of you have very distinguished opinions on what is thin and what is broad protection. I have read them. And as you know, and as you have said, Judge Berzon, the sine qua non of this is originality, right? This all boils down to originality in terms of what is protectable, and the threshold is low. But it has to be not copied from someone else. It cannot be a fact because facts are discovered. They're not created. We never have challenged or even claimed that facts are protectable or that historical events are protectable. We're not trying to monopolize the story of any of the Four Seasons' lives. All we have ever tried to do is to get protection of what Rex Woodard created, and that is the expression about these historical events. Now, that includes some things, for example, a lengthy chunk of dialogue about Walk Like a Man, where right before they hit the stage and are going into the recording studio to make the song Walk Like a Man, there is a dialogue between the DeVito character and the Bob Gaudio character that says, What do you mean, Bobby? You know, walk like a man. As opposed to what? Like a woman? And then it ends with this is an anthem for every teenage boy who's got a girl right around his little finger. But one thing is that you wander around between looking at the whole work and looking. You're saying you shouldn't have looked at discrete things, but if you look at the whole work, then this particular example, which perhaps is your strongest, goes by. Oh, no, it's one of many. It doesn't make the whole work substantially similar. It's one of many. The whole work is substantial. But it probably isn't one of many. I mean, insofar as anybody's been able to pull out actual examples, that's the only one that looks like they were actually using the same language. Well, no, no, no. With due respect, Judge Berzon, there are many examples when just before they do the song Dawn, Bob Gaudio comes out on stage in the play and says, We weren't a social movement like the Beatles. And that comes right from the work, that we weren't a social movement like the Beatles. In a different context, it's just the word social movement that overlaps. It's not the word social movement. It's the comparison. It's the metaphor. It's used to compare or contrast the Beatles versus the Four Seasons. There are numerous similarities between the works. For example, another huge scene in the play is the fake murder scene in the car, where Valley is picked up by some hoodlums, and they go out joyriding. And the details in that scene, this is an event that really happened, by the way. That is a historical event. There was a fake murder, this prank in a car. But it did not happen the way that it is depicted in the book, and there was no dialogue recalled. Both Gaudio and Valley testified, both of them, that neither of them gave one word of dialogue for this play to the authors. However, as with any play, this play is filled with dialogue. That is how the action is related and developed. And a lot of that dialogue came from the pen of Rex Woodard, who created it. There was one witness who testified, Charles Alexander, who's mentioned in the briefs, not by name, but he's a former editor of Time magazine, and his testimony is in the record, and we've cited to it in the briefs. And he said that this is very common in writings that are not fictitious, when you're relating historical events. They don't really know what was said at the time, and so the dialogue is often fictionalized to create a certain flavor. And this is recognized. This is why Nimmer said, Nimmer on copyright, which is something that we cited in our briefs for you as well. It's in a footnote. He says because of this reality and because the public generally knows that this kind of thing goes on, that this notion of copyright estoppel is seldom applied to biographies at all. Can you tell me what you mean by copyright estoppel and why it's not in your briefs and why it's not a concept that appears in any of your briefs? It's not in our briefs because we, under the presentation principle, appealed the issues that we wanted to appeal. We did not appeal the verdict on liability because it was firm and it was issued, and this is something that goes to the liability verdict. We appealed the specific judgments that the judge made. The defendants then came in, which is why we moved to strike and did all the things that you've read. The defendants came in, and they wanted to make this case about we did not infringe. They didn't file a cross appeal to do that. I know how you feel about that, Judge Berzon, because I read your 1999 decision about how the cross appeal rule is a rule of practice and it's not jurisdictional. There's actually a split. It's not jurisdictional, but you only have to have a cross appeal if you're trying to alter the verdict. That's what they're trying to do. How are they trying to alter it? We got a verdict that there is infringement, and we got two verdicts. The ultimate verdict was you lose. That was the ultimate outcome, but that was not the verdict. The verdict is you lose. There's no copyright case here. I understand that that's your position. I read your 1999 case that said it greatly. Well, I didn't write anything in 1999 because I wasn't on the court. It might not have been this court, but I read a decision from you, Your Honor, that was about this issue. Whatever it is, I wasn't on the court in 1999. Okay. I did read a decision about it. But there is actually disagreement about this. As you know, there's a split on the cross appeal rule in the circuits. I'd hate for us to be the ones that have to go up to the Supreme Court and deal with that in this case. What we've said is correct, i.e., that we're bound by that. The question is whether you're trying to alter the verdict, and the verdict is you take nothing. So as long as you take nothing, you're not altering the verdict. The Federal Circuit has issued a decision directly contravening that. I don't care what the Federal Circuit said. We're not in the Federal Circuit. Which we cite in our briefs. We're not in the Federal Circuit. We disagree. With all due respect, we think that the liability verdict is separate and that they needed a cross appeal on that. But at minimum, on this appeal, this needs to be something that they requested at some point before the lower court, before it's adjudicated for the very first time on appeal. I see that I only have a minute left. No, you're a minute into our time. I'm a minute into your time. Sorry. Why don't we hear from the other side? We will give you a chance to respond. Okay. Thank you. Now, I understand you're splitting 15 and 5. Yes, that's what we're going to try to do. Ms. Gates, if you'd put 15 on the clock, and that will maybe to some extent ameliorate the problem of the first person always goes over. Thank you, Your Honors. David Korsnick, on behalf of all of the defendants, the producers of the play Jersey Boys. Keep your voice up, that would help. Yes, the producers of the play Jersey Boys, the writers of the play, and the director of the play, and Frankie Valli and Bob Gaudio, about whom the play is about. With me is Dan Maeda, Kennedy, and Terrence Keegan, who have worked on this case throughout. Much to be said, but there is something that the plaintiff's counsel just said that I want to address immediately, and that is that there is no literary work case that has been only given thin protection anywhere, or certainly in this circuit. There is. There are many. Would you keep your voice up, please? Yes, sorry, Your Honor. There are many cases in which thin protection has been applied to a literary work. One of them is Norell. It's been a long accepted norm in this circuit, that historical works are entitled to a lesser degree of protection than fictional works. That's not an exciting or new concept at all. That I should even be contending this in front of the Ninth Circuit in 2019 is actually unusual. I think you're speaking of this whole thin, I mean the dichotomy between thin and thick protection, which maybe is unfortunate, post-dated Norell. I think Your Honor is correct. The language begins in Norell in terms of bodily appropriation, and Norell is then citing, and a number of cases cite, Learned Hand, who really I think in a lot of ways drives this thought. He says not only are all the facts recorded in history. Why? What I'm focused on is this. The district court, in its fair use doc, determination, made, incorporated a series of infringement determinations on each individual topic, right? I mean before, when he was trying to, so he's made those determinations on the record, and he was very mushy at that juncture about whether he was applying thick or thin protection. It never was really. It doesn't really matter. It doesn't matter because thin is an intrinsic level test. They can't meet it. They know they can't meet it. Just the way Apple, in its lawsuit, understood they couldn't meet it either. So they just stepped aside and said we don't need the trial if thin is the standard. And they know too. If we're looking at the infringement questions as incorporated into the fair use doctrine, because I think you have real, I mean if you believe the jury verdict, I think you have real problems with the fair use determination that the judge made. But incorporated in that was a whole series of infringement determinations. Correct. The extrinsic test was failed on every single level. So you don't even get to the, the extrinsic test was failed. And whether you apply thick or thin protection? Probably doesn't matter. Because if you, because thin or thick, bodily appropriation or the fictional level. What do you mean by bodily appropriation? Well, bodily appropriation is the term that Norell uses and that other thick cases, thin cases apply. The thin copyright phrase of that locution really emanates, I think, from Feist. But you have a string of cases beforehand like Norell. And Holing in particular, in which they say the level of protection accorded non-fiction, accorded history is low and not, doesn't say non-existent, but extremely thin. So far, we're almost five minutes into your argument. We've not yet mentioned the actual works in question. Well, let me, that's what I'd like to. It seems to me that there are some real similarities between the work done by Mr. Woodard and the play, including those that were just described by your adversary. Tell me why there's not infringement with respect, for example, Walk Like a Man, or the dialogue in the fake murder case in the car. Right. Those look to me awfully similar, and they look as though they're taken from the work. Let's do, I have in front of me Walk Like a Man. Walk Like a Man is an event. Human events involve human speech and human expression. And what people say are part of what happened. In that particular dialogue, that is a dispute that occurred at a particular place, at a particular time, among particular people. It actually happened. It happened at 1650 Broadway. It actually happened with those precise words. In substance, it certainly did, yes. Well, that was not my question. My question is, that looks to me as though the dialogue is made up by Mr. Woodard as to what likely was said. But it was not. How do you know that it was? How do I know? Yes. Well, Bob Gaudio testified that his father used the term wrapped around the finger of a little girl, and that that's where it comes from. It comes from Gaudio and his father. The term that he uses about anthem, he says, Tommy doesn't use words like that. It was the way I would defend music, musically. I said that. That's what he testified to. But it shouldn't really matter. Did Mr. Woodard ever talk to him? He did not. How would he even know that? Because the authors of the play, Rick Ellis and Marshall Brickman, interviewed Bob Gaudio and Frankie Valli at length and discussed that. But wait a minute. But it shows up in the work. Then it shows up in the play. How did it get into the work? There are two questions here. The one that you first asked me, which I addressed, but I'm not sure that it necessarily is legally relevant, and that is where did it come from? Where did they get it? I'm trying to just tell you there's evidence on the record that it came from Gaudio and the circumstances. When it was in the work, it obviously didn't come from Gaudio. Is that correct? It may well have because Woodard had 17 volumes of other people's writings and articles that included interviews with Gaudio and others, and he used their words. Did you put anything into the evidence other than Gaudio's testimony itself in terms of what Woodard had? I just want to go to this key point. When dialogue is presented as fact, then it is reportable and usable by others as fact. It's part of a human event. The one thing that is very clear is that there was a song called Walk Like a Man. There was a dispute between Frankie and Tommy and Bob about the title of that song. The dispute related to the problem that they felt that this song presented by singing Walk Like a Man in falsetto. Tommy thought that would be embarrassing to them, and the others wanted to hold on to that. They went ahead with that title, and it succeeded, and they were not embarrassed by it. So the place at which it took place, the Allegro studio at 1650 Broadway, the subject matter of the dispute, the song title, the substance of the dispute, the people who participated in that dialogue, all of that was said. Woodard did not invent that. That was real. The other thing that's significant about this... Tommy DeVito had some role in that book. I understand he didn't write any of it, but in terms of if this was in fact what was said, he could have reported it and Garnier could have reported the same thing because it's what was said. Well, he could report what was said. If it was reported as a... It could be what was said as Tommy DeVito remembered. Right? That was a representation. That's a representation. If they drew it from the book... If they asked Garnier what was said, and this is what was in fact said, and he said the same thing, that's just because it's what happened. That's what happened. And, in fact, that is what happened. The other thing that's significant is that these are used in very different ways. The way that Tommy DeVito presents this is as if it's just sort of a friendly exchange and they're all united afterward and happy about it. In the play, it becomes the first fissure, the first breakup, the first sign that Tommy is being pushed aside out of the group and that Frankie is aligning with Bob Gaudio. It ends with the stars align. So suppose this was copied and suppose it wasn't protectable for some reason. Could that lead to a conclusion of infringement by itself? No, because for a number of reasons. One, if something is reported as a fact, it may be used as a historical fact. If Lincoln has an exchange with Seward and that is recorded by Doris Kearns Goodwin, some other people can use that. It wasn't, but it's one in two thousands of the book. So what are we looking to find out? Whether the whole book is a thin projection, virtually identical, and whether the whole book is substantially similar or what? You can't do that. You have to, I guess, really do what the court did with See v. Durang. When Judge Tashima, years ago, compared these two fictional plays, there were some 29 or something of that sort similarities. He eliminated all but five as not passing the extrinsic test. And then his conclusion was the remaining five are just not enough for me to deliver an intrinsic test of the kind that Your Honor just described. So case is over. And that's really what Judge Jones could have and should have done when he reached the point that there were four. Although he called it fair use. But he really did this counting up thing as well. Correct. I think that he basically was doing Norell with Campbell on top of it. In other words, Norell is both a series of extrinsic tests that knock out virtually all of the identities claimed, and then the remaining ones are treated as common phrases that were fair use pre-Campbell, so it's pretty impressive. And they actually say, well, there's no clear economic impact from the use of these remaining phrases, so therefore it's fair use. So Jones basically is following Norell. That's my view of what it is that transpired. And if you wanted to follow just strict extrinsic test and no fair use, that would be appropriate because, frankly, our view about this case from the outset was that you never need to get to the intrinsic test. You never need to get to fair use because none of it is protectable. You take that phrase, what are you going to do about it, asshole, in the shooting in the car scene. That is a story that's Frankie's story. He's been dining out on that story for years. It happened to him. It didn't happen to Tommy. So Frankie tells Tommy this story. Tommy tells Woodard. Woodard writes it down, and now Frankie can't tell it again. That's this lawsuit. That's how unfair this lawsuit really is. It's a story about the lives of the people who are being sued and saying that they have to pay to tell the family stories, the band stories that they have. My time is running out, and I want to have my co-counsel have an opportunity to address Your Honors. Good morning. May it please the Court. Daniel Maeda for the Defendants Appellees. I want to touch upon one comment about the dialogue. As Judge Berzon indicated, the autobiography itself throughout the pages of the autobiography, from prologue to the end, purports to be a true story, a nonfiction work. In the prologue, Tommy DeVito, his voice is saying, if they only knew the whole story about the Four Seasons, then things might have been different. He talks about the fictional biographies that they have, but here he's going to tell the whole truth. He says at ER 13711, I promise my friends a complete and truthful chronicle of the Four Seasons, and that he's going to talk straight about it. So it's very clear that the work purports to be nonfiction. In the Crane v. Poetic Products case, a Southern District of New York case of 2009, the Court rejected the plaintiff in that case's attempt to recharacterize a nonfiction work as a historical work with disputed events and characters and fictionalized dialogue. At 593 F. Supp. 2nd, at 595, the Court said, reconstructed dialogue is not protected by copyright, and that's exactly what the situation is here. I want to spend a little bit of time to correct a serious misstatement in the record by Appellant. Appellant's counsel objects to our submission to this Court of a 2005 letter from Rex Woodard's sister, Cindy Seen, who the appellant claimed throughout this litigation was part of plaintiff's control group, the letter by Ms. Seen to Tommy DeVito's attorney. And that letter in our supplemental excerpts of record, page 14, has Ms. Seen admitting that the autobiography is, quote, not saleable, close quote. In the reply brief at 15, the appellant's counsel complains that the letter, quote, was not admitted into evidence. Matters to the fair use issue? To the factor for the fair use issue. Right, but there is a fair use problem, another fair use problem here, which is that there is the question of whether it was usable for a derivative works, whether it could have been sold not for itself but for a derivative works. And as to that issue, the plaintiff has submitted no evidence on that issue that there was any opportunity to license it, and the Seen letter does talk about the fact that it's not saleable because in part it needs conflict and it ideally would need to have music, which is exactly the case. They had no music rights, and, of course, Jersey Boys' primary selling point was the music of the Four Seasons, which everyone knows. But the main point I want to make is that the statement that that letter was not in the record is incorrect. It is in the record as Defendant's Exhibit 558, admitted at ER 1396. Plaintiff even admitted it in his own exhibit list. We walked the jury through it on closing arguments. Plaintiff made no objection that it wasn't in the record. The letter was not excluded by a stipulation as plaintiff claims, but it was actually in the record. And at trial we introduced Ms. Seen's videotaped testimony to the jury, including her testimony admitting that the autobiography was not saleable, lacked sufficient conflict, and needed to be marketable, more about the star of Frankie Valli, not Tommy DeVito. That's at ER 2264-89. So we appreciate the opportunity to correct the record and plaintiff's direct misstatement. In my remaining minute, I wanted to also address one point about the argument that the appellant makes about Valli and Gaudio being individually liable even if the other defendants get out on the basis of either fair use or the extrinsic test. The plaintiff argues that merely licensing a copyright right that you don't own constitutes copyright infringement, even if the licensee did not infringe a copyright. Plaintiff cites only some theoretical noncontrolling law review articles and one case, the Banco Popular case, First Circuit case in 2012. That were true, it wouldn't be on a copyright basis. I beg your pardon? It couldn't be a copyright violation to do that. That's what the plaintiff... But it could be a something, perhaps. The plaintiff alleges it is a copyright violation. In that case, he cites that case for that proposition. Diversion or something like that. But that case specifically says that mere authorization of a performing rights license in a song did not result in liability because there's no evidence that the song was ever performed. We have the same situation here. But this was performed. What do you mean by that? In that case. In that case. In our situation, plaintiff argues Valle and Gaudio wrongfully licensed the copyright to the other defendants. But if the other defendants get out because of the lack of failure to meet the extrinsic test, then there's no way Valle and Gaudio themselves could be individually liable for merely supposedly licensing. He also argues, though, that they could be liable for vicarious liability. Why not? Vicarious liability, I believe that the- If the verdict otherwise stands. Right. So the Ninth Circuit in the- No, it doesn't stand. Yeah, if the jury verdict otherwise stands. The Ninth Circuit in the Love Arts v. AT&T case, which Judge Fletcher was on the panel, held that the defendant must know of the infringement and decline to stop it or be willfully blind to the infringement. And the district court in this case correctly ruled that there was no evidence that could support a finding that Valle and Gaudio knew of the infringement by the other defendants. They didn't even know the existence of the autobiography. They did not even read the autobiography until after their depositions in this lawsuit by virtue of the plaintiff's counsel insisting on that being the case. So there was no actual knowledge of infringement, and there was certainly no willful blindness to such infringement. I see that my time has expired, but I just want to say the bottom line is that, in this case, Valle and Gaudio are being sued for telling their own life stories. That is unjust. And I would- I can't hear either of you defending the fair use decision. Are you defending the fair use decision on its own terms? I am. Because? I mean, how could it be fair use if the jury's verdict on thin protection of virtual identity was correct? It's fair use because of the factors, Your Honor, primarily the fact that it's transformative. It is a work. We've taken some facts, perhaps some surrounding expression in it, and used it for a different purpose. And I think the walk like a man example is one example. Certainly the social movement example is another one, where the concept that the Beatles were not a social movement in the two works is entirely different. In the autobiography, Tommy says, Beatles were- Not really to say it wasn't infringing. Well, it's taking something and using it in a different fashion, completely different, contrary to what the original work was. In the autobiography, Tommy is the hero and Frankie Valli is the bad guy. Ordinarily, fair use acknowledges the other work and uses it for something, for criticism, for parody, for something. Right? This isn't doing that at all. I guess I would disagree, Your Honor. The writers mined all kinds of nonfiction works that were out there, magazine articles, liner notes, any kind of books or articles that were written about the Four Seasons. Of course they used this autobiography as well, as well as interviewing Mr. DeVito extensively. They used all of that stuff to inform their perspective. From the autobiography, they took facts, anecdotes or whatever, purported to be true, and then used them in a different fashion. So the Jersey Boys tells a story about each of the Four Seasons in four different acts. And in Jersey Boys, Tommy is not the hero. Tommy's the guy who started putting the band together, but he's sort of buffoon in a sense, and Frankie is the hero. In the autobiography, it's the complete opposite. Tommy is purported to be the guy. He's the stand-up guy, and Frankie's the bad guy who's disloyal to his friends. It is a different take on it. It's taking what is in the autobiography and using it for a different purpose to create a brand new creative work. Okay, thank you very much. Thank you. Would you put two minutes on the clock, please? Thank you so much, Your Honor. Time is the enemy. Tommy DeVito swore under oath during his deposition, which comprised his testimony at trial, that the walk-like-a-man dialogue in the work and in Jersey Boys never occurred, that he never said it, that it never happened. And the other two surviving members of the Four Seasons both swore under oath that they never gave one word of dialogue to the writers of Jersey Boys. The problem with responding to parties who, unlike our briefs, do not document what they say, everything that we have told you, I'm sure you can see in our briefs, are extensively cited directly to the record, and you can see all of this yourself. Are you suggesting that we not follow the principle that if it represented itself to be a historical fact, we can take it as a historical fact? Correct, because that only applies to published works, because it is an equitable doctrine. It's called copyright estoppel. It was done in the Bikram Yoga case. It's the only time the Ninth Circuit has ever mentioned it. They did it in a footnote by citing to the Second Circuit's decision in Erica. And it was all about publication. It's equitable because if I go out and I tell the world that I am writing a nonfiction book, and then you, the reader or other historians, rely on it when it's published and take things from it as you're permitted to do because it's historical and it's not protected, then I come out and sue you and say, ha-ha, the joke's on you. That is wrong. And it's conduct that should be estopped just for the same reasons that other conduct is judicially estopped. It has never in the history of U.S. jurisprudence, and the doctrine has existed for 150 years, been applied to a published work, ever. Published or unpublished? To a published work. I mean, excuse me, to an unpublished work. Thank you for pointing that out to Judge Tashima. Second, Norell is pre-Feist. It did not apply thin protection. This court in Novak, cited in our briefs in 2010, rejected the notion and argument that Norell had anything to do with thin protection, that it required bodily appropriation or a virtual identity standard. Feist invented, coined the term thin protection. In doing so, it did so two sentences after, and contrasting the thin protection that's accorded compilations with biographies that are accorded thick protection in Harper and Row, which was its prior case. Thin protection is only applied to works that have no original creativity other than the organization and assembly of facts, so that the selection and arrangement is all that is protected. And that's why, to infringe a work like that, where only selection and arrangement is protected, the two works have to be virtually identical. If I do a best, am I out of time? Yes, you are. If you'd like to sum up a word or two. Yes. I could read you 20 minutes' worth of similarities between the works, and the things that we are referring to and we document on our briefs are things that Rex Woodard created, and we've provided documentation on all of those items. Thank you very much. Thank you. Thank both sides for their arguments. Corbello v. Valley submitted for decision.
judges: Tashima, W. Fletcher, Berzon